UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| PACIFIC COAST FEDERATION OF FISHERMENS'S ASSOCIATIONS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL MARINE FISHERIES SERVICE, et al.,<br><br>Defendants,<br>and<br><br>AMERICAN FOREST RESOURCE COUNCIL , an Oregon nonprofit corporation, et al.,<br><br>Defendant-Intervenors. | CASE NO. C04-1299RSM<br><br>ORDER ADOPTING IN PART, AND DECLINING TO ADOPT IN PART, THE REPORT AND RECOMMENDATION |

This matter is now before the Court for consideration of the Report and Recommendation filed by the Honorable Mary Alice Theiler, United States Magistrate Judge, on March 28, 2006. Dkt. # 86. The Court has reviewed the Report and Recommendation, the parties' objections and responses, and the balance of the file, and now finds and rules as follows:

(1) The thorough and well–reasoned Report and Recommendation is approved and adopted, **except** as to the conclusions in section F.1, regarding plaintiffs' challenge under the National

ORDER ON REPORT AND
RECOMMENDATION - 1

Environmental Policy Act ("NEPA"), and all of section F.2, in which the Magistrate Judge concluded that the Final Supplemental Environmental Impact Statement ("FSEIS") did not fail to disclose dissenting opinions.  For the reasons set forth in paragraph (2) below, the Court finds that the FSEIS failed to meet NEPA standards for assessing significant aquatic habitat impacts, and for the disclosure of dissenting scientists' views.

(2) **NEPA Challenges to FSEIS**

(*a*) *Standard of Review*

The National Environmental Policy Act imposes procedural, rather than substantive, requirements. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 375 (1989).   Pursuant to NEPA, federal agencies must prepare an environmental impact statement ("EIS") for "major Federal action [ ] significantly affecting the environment." 42 U.S. C. §4332 (2)©).  The Court reviews an agency's compliance with NEPA under the Administrative Procedure Act ("APA"). *Id.*   The Court applies a "rule of reason" standard to determine whether the EIS contains a "reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Center for Biological Diversity v. USFS*, 349 F.3d 1157, 1166 (9th Cir. 2003) (internal citations omitted). This standard is essentially applied in the same manner as the arbitrary and capricious standard. *Id.*   Judicial review consists of ensuring that an agency has taken a "hard look" at the environmental effects of the proposed action. *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir. 1992).

NEPA has two stated objectives. "First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action.  Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97 (1983) (internal citations omitted).  In considering a NEPA challenge, the court "may not substitute its judgment for that of the agency concerning the wisdom or prudence of a proposed action." *Laguna Greenbelt, Inc., v. U.S. Department of Transportation*, 42 F. 3d 517, 523 (9th Cir. 1994) (*quoting Oregon Environmental Council v. Kunzman*, 817 F. 2d 484, 492 (9th Cir. 1987).  Under the "rule of

 ORDER ON REPORT AND
 RECOMMENDATION - 2

reason," the court determines " 'whether the [EIS] contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences" by making 'a pragmatic judgment whether the [EIS's] form, content and preparation foster both informed decision-making and informed public participation.' " *Id., quoting Salmon River Concerned Citizens v. Robertson,* 32 F. 3d 1346, 1356 (9th Cir. 1994).  In interpreting NEPA, the court gives substantial deference to the regulations issued by the Council on Environmental Quality ("CEQ"), and both NEPA and the regulations are to be strictly interpreted. *Center for Biological Diversity*, 349 F. 3d at 1166. "Grudging, *pro forma*, compliance will not do." *California v. Block*, 690 F. 2d 753, 769 (9th Cir. 1982).

Because amendment to the Aquatic Conservation Strategy ("ACS") is a "federal action significantly affecting the environment," the Forest Service (FS) and Bureau of Land Management (BLM) were required to comply with NEPA and to prepare an Environmental Impact Statement.  42 U.S.C. §4332(2)(C). The agencies released their FSEIS in October 2003.  As in the 1994 FSEIS, the 2003 FSEIS contained viewpoints of a collection of respected scientists who were part of the government's Forest Ecosystem Management Assessment Team ("FEMAT").

Plaintiffs' complaint alleges NEPA violations under three categories: (1) the FSEIS failed to assess the significant aquatic habitat impacts of the amendment; (2)  the FSEIS failed to disclose and discuss  dissenting views of respected scientists; and (3) the FSEIS failed to provide a candid, objective assessment of reasonable alternatives.  The Court shall address arguments (1) and (2), which correspond to sections F.1 and F.2 in the Report and Recommendation.  The Court adopts without alteration section F.3 of the Report and Recommendation, addressing argument (3), the assessment of reasonable alternatives.

*(b)  Assessment of Significant Aquatic Habitat Impact*

The Court fully adopts, without restating, the discussion set forth in the Report and Recommendation at pages 29 to 34, line 16, regarding the NEPA requirement that an EIS must disclose any indirect effects, and consider "every significant aspect of the environmental impact of a proposed action. . . ." *Kern v. Bureau of Land Management*, 284 F. 3d 1062, 1066 (9th Cir. 2002).   In

ORDER ON REPORT AND RECOMMENDATION - 3

concluding that section, the Magistrate Judge noted that the federal defendants' "blithe assertion that the amendments to the ACS impose no fundamental changes is troublesome." Nevertheless, she concluded,

> it is not clear to the undersigned in what respects the 1994 FSEIS did not adequately address impacts, cumulative or otherwise, on the programmatic level even in light of the amendments to the ACS. Nor is it clear that subsequent site-specific consultations will not adequately assess such impacts. Without such a showing, it cannot be said that the 2003 FSEIS arbitrarily and capriciously tiered to the extensive assessment in the 1994 FSEIS.

Report and Recommendation, p. 35. Plaintiffs' objections have persuaded the Court that this conclusion must be revised.

The 2003 FSEIS states, with respect to the environmental consequences of the proposed ACS amendment,

> The proposed amendment has the potential to affect agency success implementing the timber sale program envisioned under the Northwest Forest Plan. Timber sales are needed to achieve the socio-economic and ecosystem management goals of the Northwest Forest Plan. The degree to which current PSQs[1] may be attained is the primary indicator for agency success in this regard.
>
> As discussed under Affected Environment, the agencies have not been able to achieve the level of timber sales predicted for the Northwest Forest Plan. The Northwest Forest Plan assumed that 90 percent of the early decades PSQ would come from late-successional and old-growth forest, much of it through regeneration harvest. However, given the court interpretations of the ACS in the PCFFA litigation, the PSQ cannot be sustained, because few timber sales can be designed to avoid all disturbance to aquatic and/or riparian components.
>
> **For instance, timber harvest removes canopy and exposes some land to accelerated erosion. Road work associated with the timber sales may result in short-term sedimentation.** In the PCFFF litigation, the court considered these types of effects incompatible with achieving ACS objectives.

2003 FSEIS, pp. 49-50 (emphasis added).

With these two sentences, the FSEIS describes the habitat-degrading effects of the activities that were not allowed under the previous ACS, but could go forward under the amended ACS. Both FEMAT and the NFP contemplate that projects must be consistent with ACS objectives. Previously, to meet ACS objectives, the Forest Service needed to ensure that road densities and the total amount of a watershed in clearcut condition would not alter runoff and erosion patterns to the detriment of water quality and fish

---

[1] Probable Sale Quantity, an estimate of annual timber sale levels likely to be achieved. 2003 FSEIS, p. 41.

ORDER ON REPORT AND
RECOMMENDATION - 4

survival. Because the ACS amendment eliminates this requirement, the impacts of that change must be fully assessed. As stated recently by this Court, where an agency has previously made a policy choice to conform to a particular standard, and now seeks to amend that standard, "the Agencies have an obligation under NEPA to disclose and explain on what basis they deemed the standard necessary before but assume it is not now." *Northwest Ecosystem Alliance v. Rey*, 380 F. Supp. 2d 1175, 1192 (W.D.Wash. 2005). Under this reasoning, the 2003 FSEIS assessment of the impact of the ACS amendment is inadequate and fails to conform to NEPA standards.

*(c) Disclosure of Dissenting Views*

Regulations governing the adequacy of an EIS require that opposing scientific views be disclosed and discussed at appropriate points. The relevant regulation specify that in a draft EIS, the agency "shall make every effort to disclose and discuss at appropriate points ... all major points of view on the environmental impacts of the proposed action. 40 C.F.R. §1502.9(a). Then, in the final EIS, the agency "shall discuss at appropriate points . . . any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised." 40 C.F.R. § 1502.9(b).

"NEPA requires that the agency candidly disclose in its EIS the risks of its proposed action, and that it respond to adverse opinions held by respected scientists." *Seattle Audubon Society v. Moseley*, 798 F. Supp.1473, 1482 (W.D.Wash. 1992); *affirmed,* 998 F. 2d 699 (9th Cir. 1993). An EIS violates NEPA where it fails to "disclose and discuss the responsible opposing views." *Center for Biological Diversity v. Forest Service*, 349 F. 3d at 1169. The Report and Recommendation concluded that plaintiffs did not demonstrate that the 2003 FSEIS failed to disclose and discuss those opinions as required by NEPA. As set forth below, plaintiffs' objections to the Report and Recommendation have persuaded the Court that the FSEIS does not properly disclose and discuss the views of dissenting scientists, and therefore is inadequate under NEPA.

The Court is not required to decide whether the EIS is based on the best scientific methodology available, or to resolve disagreements among experts. Instead, the Court's task is to ensure that the

ORDER ON REPORT AND
RECOMMENDATION - 5

procedure followed resulted in a reasoned analysis of the evidence. *Seattle Audubon Society v. Moseley*, 798 F.Supp 1473 (W.D. Wash. 1992) (finding that the Forest Service was required to address in the FEIS scientific criticisms opposing evidence on which the final strategy was based). *See also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989) (NEPA "prohibits uninformed – rather than unwise – agency action.").

      Here, plaintiffs contend that respected scientists expressed dissenting scientific viewpoints regarding the environmental impacts of the ACS amendment. This assertion is based on the fact that beginning in January, 2003, the Forest Service sought input from FEMAT members as to the intent behind the ACS, and submitted a questionnaire to these scientists. Some of the responses reflected the scientists' disagreement with the assertion that the amended ACS would be consistent with the original objectives of the ACS, particularly as to the requirement that projects be consistent with the ACS at the site, watershed, and landscape scales. Administrative Record, FS/BLM at 2251, 2256, 2259, 2264. These FEMAT scientists, who designed the ACS, expressed dissenting opinions and disagreement concerning potential negative cumulative effects of the ACS amendment. The FEMAT scientists are respected scientists and their views relevant. Furthermore, they were not alone in expressing dissent. FWS scientists submitted comments that the proposed language would "remove or weaken several key conservation provisions for aquatic species at the plan level" and eliminate the "assurance that projects developed and implemented under the ACS guidance will contribute to restoring and/or maintaining the ecological health of aquatic ecosystems." Administrative Record, FS/BLM 5944. The FWS scientists further stated that "this outcome is of great concern to us." *Id.* at 5945.

      These and other comments and dissenting opinions were not disclosed in the body of the FSEIS. Instead, buried in the appendices as a summary of public comments on the draft SEIS, is the following statement:

> The FEMAT Report is the best available science particularly on the specific issues being considered in the proposal, yet the proposal significantly diverges from the FEMAT regarding several important ACS provisions. The Draft SEIS offers no science in support of these departures, and in fact offers no discussion of the scientific issues surrounding these departures . . . Importantly, the ACS EIS Team interviewed FEMAT scientists about the extent to which the changes that are now included in the Draft SEIS were consistent

ORDER ON REPORT AND
RECOMMENDATION - 6

>with their views of how the ACS was intended to function. On several key points the scientists' responses diverge from the actions taken in the proposal. For example, scientists indicated support for site-scaled evaluations of projects as they relate to meeting the goals of the ACS, and noted that some site-scale projects could be inconsistent with meeting the ACS objectives at the watershed or larger scales. Additionally, scientists stated that site-scaled compliance with Section C and D alone was not consistent with their view of how the ACS was designed to function.

2003 FSEIS, Appendix C, p. 57 (ellipses in original).  The response of the agency to this comment states, in its entirety: "The scientist interviews were part of the scoping effort but did not yield consistent results.  Agency scientists consistently emphasize the role of watershed analysis in providing context for project planning." *Id*., p. 58.

This "disclosure" wholly fails to meet the standards for adequate disclosure and discussion of dissenting scientific opinions.  The purpose of the appendix is to reproduce comments received by the agency on a draft EIS during the public comment period.  Here, the draft EIS did itself not disclose any dissenting opinions.  Therefore, the agency was required to "discuss at appropriate points . . . any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised." 40 C.F.R. § 1502.9(b).  Here, the dissenting views of responsible scientists were neither set forth in substance, nor their import discussed, in the FSEIS.

Further, several of the FEMAT scientists' responses regarding original intent of the ACS were misrepresented in a different section of the appendix.  One response from the FEMAT scientists was that "we think the language proposed in the Draft SEIS is not consistent with our original intent for the ACS so does not clarify its interpretation." Administrative Record, FS/BLM at 2259.  Not only was this and similar critical statements not disclosed, they were misrepresented in this response to a citizen comment expressing concern over the proposed ACS amendment:

>**Comment**: The existing rules represent a consensus among the various parties who crafted the Northwest Forest Plan in 1994.  We find it upsetting that the Forest Service now wishes to supplant this consensus by altering the scope of the ACS.  The existing language of the ACS should be preserved without changes.  The ACS rules are functioning exactly as intended.  That is, they serve as a check against the rampant ecosystem destruction that has characterized so much of Forest Service policy.
>
>**Response**:  The various parties who crafted the Northwest Forest Plan did not intend for the ACS objectives to be interpreted as standards to be applies at all scales.  The Draft SIES stated that the agencies have had difficulty planning and implementing projects

ORDER ON REPORT AND
RECOMMENDATION - 7

>that follow Northwest Forest Plan principles (as indicated by annual sale quantity sold). Part of the difficulty is due to impossible expectations raised by interpretations of ACS language.

2003 FSEIS, Appendix C, p. 44.  This statement as to the intent of the drafters of the Northwest Forest Plan is contrary to the opinions that were actually expressed by the FEMAT scientists in response to the questionnaire.

Even if the scientists' opinions had been adequately and accurately stated and discussed, their relegation to the comment and response section of the appendix was improper under NEPA. *Friends of the Earth v. Hall*, 693 F. Supp. at 934.  Disclosures and discussions must be in the body of the EIS itself. *Center for Biological Diversity v. Forest Service*, 349 F. 3d at 1169.  Furthermore, within that body of the EIS, the agency must not only recite dissenting opinions, it must "analyze," "respond to" and "discuss" them. *Id*. at 1168.  None of that was done here.

"Where the agency fails to acknowledge the opinions held by well-respected scientists concerning the hazards of the proposed action, the EIS is fatally deficient."  *Friends of the Earth v. Hall*, 693 F. Supp. at 934.  As it did in that case, the Court concludes that the appropriate place to disclose and discuss the opposing views was in the body of the EIS, rather than in the comments and response section. *Id*.  The FSEIS thus fails to meet NEPA standards, in that dissenting views were not disclosed and discussed at the appropriate point, nor with sufficient depth, to "inform decision-makers of the full range of responsible opinion on the environmental effects." *Id*.

(3) **Conclusion**

Accordingly, plaintiff's motion for summary judgment (Dkt. # 52) is GRANTED, and defendants' two motions for summary judgment (Dkt. ## 68, 69) are DENIED.  It is hereby ORDERED that:

(a) the biological opinions on the amendment to the Aquatic Conservation Strategy of the Northwest Forest Plan ("ACS Amendment") issued by defendants NMFS and FWS are arbitrary, capricious, and contrary to the Endangered Species Act, 16 U.S.C. § 1536(a)(2), in violation of the Administrative Procedure Act, 5 U.S.C. § 706, and shall accordingly be set aside;

(b) the supplemental environmental impact statement (FSEIS) issued by defendants Department of

ORDER ON REPORT AND
RECOMMENDATION - 8

1  Agriculture and Department of the Interior on the ACS amendments is arbitrary and capricious and
2  contrary to the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C), in violation of the
3  Administrative Procedure Act, 5 U.S.C. § 706, and shall accordingly be set aside; and
4        (c) the ACS amendment adopted by defendants Department of Agriculture and Department of the
5  Interior in the Record of Decision dated March 2004 fails to comply with NEPA and the ESA, and is
6  accordingly set aside.
7        The parties shall advise the Court, within twenty days of the date of this Order, as to any further
8  Court action necessary before final judgment is entered.
9        Dated this 30th day of March, 2007.

                                            RICARDO S. MARTINEZ
                                            UNITED STATES DISTRICT JUDGE

ORDER ON REPORT AND
RECOMMENDATION - 9